UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF ALABAMA

ROSIE CLIATT, as Personal Representative )
of the Estate of DONTAVIUS CLIATT, )
                         ) Case #3:06cv471-SRW [WO]
Plaintiff )  Hon. Mark E. Fuller
                              )
                              )
vs. )
                              )
PHENIX CITY, ALABAMA, et al., )
                              )
Defendants. )
_____/

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. RULE CIV. PROC. 56(c)**

## I. INTRODUCTION

      This case concerns the wrongful death of Mr. Dontavius Cliatt.  Mr. Cliatt was gunned down by police officers in Phenix City, Alabama in a barrage of 57 rounds of gunfire after what was initially a routine traffic stop.  Mr. Cliatt was African American and the police officers involved in the shooting were all Caucasian.  Further, it appears almost certain that shortly before he was killed by the police, Mr. Cliatt himself killed a Caucasian man.

      The police claim they fired on Mr. Cliatt only after he fired a shot at them.  Although the police's version of the events leading up to Mr. Cliatt's death are disputed, even if what the police claim is true, their actions still violated Mr. Cliatt's civil and constitutional rights and led to his wrongful death.  This is true for two reasons, both of which are supported by federal case law.

      <u>First</u>, even if Mr. Cliatt did fire first at the police officers, he did so only after the police created a situation so tense and so dangerous that it ultimately provoked Mr. Cliatt into taking

violent action against them. A police officer who resorts to deadly force in self defense violates the Fourth Amendment if he unreasonably creates the circumstances where the use of deadly force becomes necessary. In other words, a police officer cannot claim immunity from a deadly force claim by arguing self defense if the officer created the circumstances where it became necessary to use deadly force in self defense. That is precisely what happened in Mr. Cliatt's case.

Second, even if the police were entitled to use some level of force to subdue Mr. Cliatt, to be entitled to immunity for their actions, they were limited to using only that level of force reasonably *proportionate* to bring the situation under control. In other words, the police are not free to simply blast away at a criminal suspect, even one who fires a shot at them. Rather, the police's use of force must be sufficiently tailored to a particular situation such that it is reasonably proportionate to the threat of danger. Firing 57 rounds at Mr. Cliatt simply cannot constitute a reasonable use of force against him. Rather, it was a brutal, gratuitous use of force designed to punish and exterminate Mr. Cliatt.

Although some may believe that justice was served when the police cornered Mr. Cliatt and shot him down, the police's action unnecessarily deprived Mr. Cliatt of his life and his day in court, thus violating his civil and constitutional rights. This is true even though Mr. Cliatt may have killed a man and ultimately deserved to be punished for that crime.

## II. BACKGROUND FACTS

Mr. Cliatt died from gunshot wounds he received on May 3, 2003, in a shooting involving sheriff deputies from Russell County, Alabama and police officers from Phenix City, Alabama. See Exhibit 1, Certificate of Death; Exhibit 2, Medical, Autopsy and Firearms Reports. On that date, it appears that Mr. Cliatt robbed a used car dealer and killed him during

the robbery.  See Exhibit 3, Alabama Uniform Arrest Record re Denise Mariette Williams.  It

appears that after robbing and killing the used car dealer, Mr. Cliatt rode around town with his

girlfriend, Denise Williams.  See Exhibit 3.  As they were driving, Mr. Cliatt and Ms. Williams

passed by a police patrol vehicle that was coming from the opposite direction.  See Exhibit 4,

Police Memoranda re Interviews with Denise Williams.  After passing by the patrol vehicle, Mr.

Cliatt pulled into a random driveway and put his vehicle into park.  See Exhibit 4.  In her

statement to police, Ms. Williams said that Mr. Cliatt pulled off the road because he did not have

his driver license or automobile registration with him and became nervous when he saw the

patrol vehicle.  See Exhibit 4.  Seeing Mr. Cliatt pull into the driveway, the patrol vehicle turned

around and came back and pulled in directly behind Mr. Cliatt's vehicle.  See Exhibit 4.  At that

point, Mr. Cliatt's vehicle was parked on the far right side of the driveway, immediately in front

the house's closed garage door.  A large pickup truck was immediately to the left of Mr. Cliatt's

vehicle, literally only a few feet from the driver side door of Mr. Cliatt's vehicle.  As such, after

the police car pulled in behind him, Mr. Cliatt literally had no where to go as he was at the

narrow end of what basically amounted to a large "V" made up of the police car, his vehicle, the

large truck and the house.

   When Mr. Cliatt was stopped, the police asked for personal identification and his

automobile registration.  See Exhibit 4.  They apparently became suspicious when Mr. Cliatt

could not produce either of these documents.  It appears that the police radioed headquarters to

check on Mr. Cliatt's status, at which point an officer at the scene was advised about the robbery

and murder of the used car dealer.  See Exhibit 5, May 23, 2003 Report of Captain J. Hart.  Upon

being advised that Mr. Cliatt and his vehicle matched the description given out of the robbery

and murder suspect, the police officer on the scene called for back up assistance from other

police officers.  See Exhibit 5.  In response, a police SWAT team arrived on the scene.  See Exhibit 5.  At this point, the facts of the story diverge depending on who is telling the story.

According to Ms. Williams, following the original stop, the police waited for back up to arrive, and then once it did, they fired a shot at Mr. Cliatt through the rear window of his vehicle, hitting him in the back.  See Exhibit 4.  Mr. Cliatt exited the car and returned fire to the officers.  See Exhibit 4.  The police then shot and killed him.  See Exhibit 4.  However, according to the police, after being advised that Mr. Cliatt and his vehicle matched the murder suspect's description, they approached his car and Mr. Cliatt exited the car with his gun out and shot at them.  See Exhibit 5.  The police then responded by firing 57 rounds back at Mr. Cliatt, hitting him seven times and killing him.  See Exhibit 5; Exhibit 2.

Although a certain amount of discovery has been taken, the precise facts of this case are not much clearer than when this case was first filed.  Ms. Williams, who survived the shooting, was charged for allegedly participating in the death of the used car dealer (Exhibit 6, Russell County District Attorney Felony Intake and Charging Sheet), but was acquitted.  Ms. Williams' version of the events surrounding Mr. Cliatt's death have not always been entirely consistent, which may well be expected and fairly unremarkable given the confusion and violence surrounding Mr. Cliatt's death.

The most interesting aspect of this case from a factual standpoint is the reaction of the authorities in Phenix City.  From the beginning, the police and local district attorney have acted as if they have something to hide.  Rosie Cliatt, Mr. Cliatt's mother, and the personal representative of his estate, always wondered what actually happened in this incident.  To this end, she opened an estate for her son and was appointed personal representative.  See Exhibit 7, Letters of Administration.  She contacted the local coroner in the summer of 2003 in an attempt

to obtain an autopsy report so she could see for herself what the medical examiner said had taken place.  See Exhibit 8, Affidavit of Rosie Cliatt.  She was not given the autopsy report until late July of 2004, more than 15 months after Mr. Cliatt's death.  See Exhibit 8.

This attorney did not fair much better when he tried to obtain information about this case from the authorities.  Upon being contacted by Mrs. Cliatt to see if he would take her case, this attorney traveled to Phenix City and met with the Phenix City District Attorney, Kenneth Davis, in June of 2005.  See Exhibit 9, Affidavit of Fulton B. Eaglin.  After researching the court records of Ms. Williams' trial, this attorney knew that the police had made a recording of her interrogation.  See Exhibit 9.  This attorney requested a copy of the tape, and was personally assured by Mr. Davis that one would be given to him.  See Exhibit 9.  After this attorney returned home to Michigan, no tape was forthcoming.  See Exhibit 9.  This attorney's many attempts to contact Mr. Davis went unanswered.  See Exhibit 9.  It was only after very heated and contentious discovery that this attorney was given a copy of Ms. Williams' interrogation.

Notwithstanding the intransigence of the authorities to provide information about this incident, the information that Mr. Cliatt's estate has been able to obtain during discovery is very interesting.  Perhaps the most interesting piece of information is the report of Captain J. Hart, who was tasked with conducting an internal police investigation of the shooting death of Mr. Cliatt.  See Exhibit 5.  **Captain Hart concluded that there were issues of concern relative to how the police officers handled the incident that led to the shooting death of Mr. Cliatt. See Exhibit 5.  Further, Captain Hart specifically concluded that the manner in which the police handled the incident may have provoked Mr. Cliatt into firing at the officers.  See Exhibit 5, p. 15.**  This conclusion was also apparently shared by the Phenix City Chief of Police, who commented over the police radio immediately after Mr. Cliatt was killed that he had

concerns over the way the police handled the incident.  <u>See Exhibit 10, Transcript of Police</u>

<u>Communications (emphasis added)</u>.

      Captain Hart's report first notes that although "there is some confusion as to who fired

the initial shot (assailant or officers), there is no dispute that the assailant presented a firearm

at/towards the officers."  <u>Exhibit 10, p. 14</u>.  As it relates to the events leading up to Mr. Cliatt's

actions, Captain Hart's report provides the following observations:

> I do have some concern about the lack of planning/coordination by the officers on the scene prior to approaching the suspect(s).  **Statements by the five involved officers are consistent on the fact that upon their arrival, <u>the suspect(s) presented no immediate threat</u>, <u>both being seated in the Saturn</u> and <u>no firearm yet presented</u>.  Lt. Daughtry stated that he attempted to lay out a plan of action, but that <u>various officers/deputies approached the Saturn almost immediately upon arrival with no coordination</u>.  This <u>rash</u> approach may have <u>dictated the subsequent actions of the offender (Cliatt)</u>**.  It should be noted that this agency is semi-paramilitary in structure/organization and respect of/to supervisors is necessary to forward the mission of this agency in a competent manner.
>
> **I also have some concern about the actual approach of the Saturn made by the officers.**  During the course of the interviews, the officers stated that they were conducting a felony take-down, however, their definitions of what a felony take-down consisted of varied.

<u>Exhibit 10, p. 15</u> (emphasis added).

      Officer Hart's report also notes that curious fact that although there were three police

vehicles equipped with video cameras at the scene of Mr. Cliatt's shooting, none of these video

cameras was turned on during the incident.  <u>See Exhibit 10, p. 15</u>.  Officer Hart ended his report

by recommending refresher training for all officers on felony/high risk take-downs and arrests.

<u>Exhibit 10, p. 16</u>.  He also recommended refresher training regarding understanding the chain of

command, supervisor responsibility and respect of subordinates to supervisors relative to

coordinating and executing responses to various police situations.  <u>Exhibit 10, p. 16</u>.  Captain

Hart did not recommend disciplinary measures against the five officers involved in shooting Mr.
Cliatt because in his view once Mr. Cliatt presented a firearm at the officers, they were justified
in using deadly force to subdue Mr. Cliatt. <u>Exhibit 10, p. 16</u>.

### III.  LEGAL ARGUMENT

Even if the police version of the events leading to Mr. Cliatt's death is to be believed,
their actions against him still violated his civil rights and caused his wrongful death.  Although
the facts of this case are anything but clear, for purposes of this motion, Mr. Cliatt's estate will
assume that the police version of this incident (as related in Captain Hart's report) is true.  In
other words, the relief requested in this motion is premised on the following factual assumptions:

- After the initial stop and Mr. Cliatt was unable to provide a driver license or automobile registration, the police radioed into headquarters and were advised that Mr. Cliatt and his vehicle matched the murder suspect's description.

- The police on the scene called for back up from the local SWAT team.

- Once the SWAT team arrived on the scene, at least five police officers immediately approached Mr. Cliatt's car in inconsistent, uncoordinated manner, with guns drawn.

- Various officers yelled commands toward Mr. Cliatt's car as they approached.

- Mr. Cliatt "rolled" out of the car with his gun out and fired a shot at the police officers.

- After Mr. Cliatt fired a shot at the police officers and was laying prone on the ground, the five officers fired 57 rounds back at Mr. Cliatt and killed him.

<u>See Exhibit 5</u>.

Based on these assumed facts, Mr. Cliatt's estate is entitled to summary judgment on its claims as a matter of law.  This is true for two reasons.  First, as Captain Hart noted in his report, although Mr. Cliatt presented no immediate threat, the police officers on the scene acted in such a "rash" manner that they ultimately provoked Mr. Cliatt to violence.  Contrary to Captain Hart's ultimate conclusion, federal law does not permit police officers to create situations that provoke citizens into violent acts, and then turn around and use deadly force to regain control of the dangerous situation that they themselves created.  Second, assuming that – despite their role in provoking Mr. Cliatt – the police were entitled to use some level of force to subdue him, binding precedent limits the police to using only that level of force reasonably *proportionate* to the need for that force.  57 rounds fired by five officers against a single shot fired by a suspect laying prone on the ground, with nowhere to run can hardly be described as proportionate force.  Indeed, just the opposite is true as a matter of law.

<u>STANDARD OF REVIEW FOR SUMMARY JUDGMENT MOTIONS</u>

Since Mr. Cliatt's estate has assumed the veracity of the police version of his death for purposes of this motion, there are no disputed issues of fact and the issues presented by this motion can be ruled on as a matter of law.  Federal Rule of Civil Procedure 56(c) provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The Supreme Court has stated the following concerning the standard of review of summary judgment motions:

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the burden of proof

at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

* * *

The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984). Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources. But with the advent of "notice pleading," the motion to dismiss seldom fulfills this function any more, and its place has been taken by the motion for summary judgment. Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323, 237 (1986).

<u>STANDARD OF REVIEW FOR ACTIONS BROUGHT PURSUANT TO 42 U.S.C. SEC. 1983, AND THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION</u>

To succeed on a section 1983 claim, a plaintiff must establish that he or she was deprived of a constitutional right. See *Baker v. McCollan*, 443 U.S. 137 (1979); *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981). Mr. Cliatt's estate asserts that he was deprived of both his Fourth Amendment rights and his substantive due process rights under the Fourteenth Amendment.

9

The Fourth Amendment provides in pertinent part that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures shall not be violated."  As the Supreme Court noted *Tennessee v. Garne*r, 471 U.S. 1 (1985), "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Id.* at 7.  Reasonableness is determined by " 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " *Id.* at 8, 9 (quoting *United States v. Place*, 462 U.S. 696 (1983)).

Eleventh Circuit precedent aptly describes the standard of review for substantive due process claims under the Fourteenth Amendment:

> The starting point for any discussion of a substantive due process claim in the context of police abuse is Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), in which the Supreme Court held that incriminating evidence obtained by subjecting a criminal suspect to a stomach pump was inadmissible. As the Court explained, substantive due process is violated when the government engages in actions that " 'offend those canons of decency and fairness which express the notions of English-speaking peoples even toward those charged with the most heinous offenses.' " Id. at 169, 72 S.Ct. at 208 (quoting Malinski v. New York, 324 U.S. 401, 416-17, 65 S.Ct. 781, 788-89, 89 L.Ed. 1029 (1945)). In other words, government conduct that "shocks the conscience," id. at 172, 72 S.Ct. at 209, or "offend[s] even hardened sensibilities," id., 72 S.Ct. at 210, transgresses the bounds of substantive due process.

> Since Rochin, the lower courts have developed more definite standards for identifying substantive due process violations. In determining whether force used by police officers amounts to a constitutional deprivation, a court must consider " 'the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " Gilmere v. City of Atlanta, 774 F.2d 1495, 1500-01 (11th Cir.1985) (en banc) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

*O'Neal v. DeKalb County, et al.*, 850 F.2d 653 (1988).

<u>THE POLICE ARE NOT IMMUNE FROM LIABILTY FOR THEIR USE OF DEADLY
FORCE TO SUBDUE MR. CLIATT AFTER THEY PROVOKED HIM TO VIOLENCE</u>

Captain Hart's report makes it clear that the five officers who were involved in killing

Mr. Cliatt did not properly assert or maintain control of the situation.  Captain Hart clearly

expressed that he believed the conduct of the officers may have led Mr. Cliatt to react the way he

did.  Once police officers create a situation that provokes a citizen to violence, those officers are

not shielded from liability for harm they inflict that is the result of their improper conduct.  See

*Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir. 1985).  In *Gilmere*, the Eleventh Circuit

Court of Appeals affirmed a district court's ruling that held two police officers liable for

shooting to death a man whom they were attempting to take into custody.

The *Gilmere* case arose out of the shooting death of Mr. Thomas Patillo, who was killed

by an Atlanta policeman during the course of an attempted arrest.  Before being killed by the

police, Mr. Patillo spent New Years day in 1980 drinking heavily and driving around Atlanta.

During his escapade, Mr. Patillo almost collided with a van and then argued with the van's

driver.  Afterward, the van's driver called the police, claiming that Mr. Patillo had brought out a

gun from the trunk of his car and threatened him.  Two Atlanta police officers responded to the

call.  When they arrived at Mr. Patillo's home, they ordered him to the police car so they could

question him.  The Court of Appeals' opinion describes what happens next:

> Patillo initially put up some resistance by attempting to flee and then flailing his
> arms about, but these efforts were ineffectual because of his drunken condition.
> The officers then began escorting him by force and, according to eyewitnesses,
> began beating him about the head.  As the party neared the patrol car, Patillo
> broke free of their hold.  During the ensuing scuffle, [a police officer] shot Patillo
> in the stomach and killed him.
>
> *Patillo, supra*, 1497.

Mr. Patillo's executrix sued the officers and the City of Atlanta under 42 U.S.C. Sec. 1983 for violations of his fourth, eighth, and fourteenth amendment rights, as well as under Georgia state tort law.  The case went to a bench trial, with the district court holding the police officer who shot Mr. Patillo liable under section 1983 for his wrongful death on the basis that a police officer cannot claim immunity from a deadly force claim by arguing self defense if the officer created the circumstances where it became necessary to use deadly force in self defense. The district court also held the City of Atlanta liable for its grossly negligent training of the police officer.

A panel of the Eleventh Circuit Court of Appeals reversed the district court's ruling. However, an *en banc* panel of the appeals court reversed the earlier panel's ruling and affirmed the district court's decision to hold the police and City of Atlanta liable for Mr. Patillo's death. In reinstating the district court's decision, the *en banc* panel wrestled with whether the circumstances of Mr. Patillo's death met the "shocks the conscience" standard required of substantive due process claims by *Rochin v. California*, 342 U.S. 165 (1952).  Specifically, the court noted that the police officer who killed Mr. Patillo had a purported fear of bodily injury, which was presumably subjectively reasonable since Mr. Patillo was apparently free and moving in the direction of the police officer.  However, the *en banc* panel ultimately concluded that the use of deadly force against Mr. Patillo was unreasonable based on the fact that it was the police who had provoked Mr. Patillo into behaving in the manner which ultimately led to his death.  In this regard, the *en banc* panel stated as follows:

> Here, however, any fear on the officer's part was the fear of retaliation against his own unjustified physical abuse.  We conclude that a moment of legitimate fear should not preclude liability for a harm which largely resulted from his own improper use of his official power.

*Gilmere, supra* at 1501.

Thus, *Gilmere* stands for the simple proposition that a police officer who resorts to deadly force in self defense violates the Fourth Amendment if he unreasonably creates the circumstances in which the use of deadly force becomes necessary. Therefore, in the case at bar, even if Mr. Cliatt did in fact fire first at the police officers, he did so only after the police created a situation so tense and so dangerous that it ultimately provoked Mr. Cliatt into taking violent action against the police. This is not an outlandish claim advanced by Mr. Cliatt's estate. Rather, it is the considered conclusion of an internal police investigation into the circumstances of Mr. Cliatt's death. Indeed, Mr. Cliatt did not display aggressive behavior when initially pulled over. He was compliant and non-threatening. Only when all the police officers drew their guns and converged on his car in a rash, inconsistent, confusing, and threatening manner did he get out of the car and shoot at the officers.

Under *Gilmere*, the individual police officers in the instant case cannot escape liability for killing Mr. Cliatt even if they had a legitimate fear that he could harm them because that potential harm was the result of their own failure to follow proper police procedures for taking Mr. Cliatt into custody.

<u>EVEN IF THE POLICE WERE ENTITLED TO USE SOME
LEVEL OF FORCE AGAINST MR. CLIATT, FIRING 57 ROUNDS AT
HIM WAS, AS A MATTER OF LAW, DISPROPORTIONATE TO THE
LEVEL OF FORCE NEEDED TO TAKE MR. CLIATT INTO CUSTODY</u>

Once the police created the tinderbox that caused Mr. Cliatt's violent reaction, what level of force were they entitled to use to bring the situation back under control? It is not disputed that the police are entitled to use *some* level of force to restore order to a deteriorating situation, even if the police caused the situation to deteriorate in the first place. The question is: how much

force?  Again there is precedent that speaks directly to this issue.  According to this case law, the police are limited to using only that level of force reasonably *proportionate* to the need for that force.  In other words, the police are not free to simply blast away at a criminal suspect, even one who fires a shot at them.  Rather, the police's use of force must be sufficiently tailored to a particular situation such that it is reasonably proportionate to the threat of danger.

For example, in *Hopkins v. Andaya, et al.*, 958 F.2d 881 (9th Cir. 1992), the Ninth Circuit Court of Appeals reversed the district court's grant of summary disposition against the estate of a man who was shot to death by an Oakland, California police officer.[1]  In *Hopkins*, the police shot Jerry Stancill to death after a bizarre sequence of events.  These events were recited by the court of appeals as follows:

> Oakland Police Officer Marc Andaya responded to a call on the night of May 21, 1984 reporting that Jerry Stancill was creating a disturbance at the Capri Motel.  Because Stancill had allegedly threatened "to shoot the place up," Andaya searched Stancill and determined that he was unarmed. He then sent Stancill on his way.
>
> During this encounter, Andaya observed Stancill acting strangely and talking to himself in an illogical manner. He and a fellow officer followed Stancill and stopped him to determine whether Stancill should be detained for a psychiatric evaluation in accordance with California law. The officers did not detain Stancill because they did not feel that he posed "a threat to himself or others."
>
> A short time later, Andaya was completing paperwork in a parking lot when he heard Stancill "howling or braying" under a traffic light. When Stancill began to walk back towards the Capri Motel, Andaya pulled his car into an abandoned lot behind Stancill and sounded his siren. Stancill then approached the car.
>
> According to Andaya, Stancill put his hands on the police car in a frisk position, and asked "what are you going to do?" Andaya claims that Stancill's manner then changed: he became hostile and began approaching Andaya in a threatening manner. Andaya testified that he backed away, and drew his baton and

---

[1] Parts of the *Hopkins* decision have been criticized, disagreed with, and possibly even implicitly overruled. However, no court with the authority to overrule *Hopkins* has overruled its holding that the use of force by police officers in the face of danger must be proportionate to the need for that force.

14

began hitting Stancill's arms to keep him away. Andaya then says that Stancill grabbed Andaya's baton and caused him to fall backwards and hit his head on the ground. Andaya says this blow was sufficiently hard to "daze" him.

According to Andaya, Stancill then hit him with the baton "at least ten times" in spite of Andaya's efforts to evade the blows. Andaya claims that after a minute or so of repeated blows and kicks to the head or body, he drew his revolver and warned Stancill to stop. Stancill kept attacking, so Andaya shot at him six times at a range of three to four feet in several spaced volleys.

Andaya testified that he knew the shots had hit Stancill, since he saw blood and told Stancill "You're hurt. Don't get up." However, he also stated that the shots did not stop Stancill from coming at him. He then managed to bring Stancill to the ground and wrestled with him for about a minute. Andaya then claims he managed to get up and back away, but that Stancill got up as well. With Stancill advancing on him, Andaya claims that he somehow managed to radio for help, throw the radio down, empty the spent cartridges from his revolver and reload it, cross the street and hide behind a car in a gas station on the other side of the street. Once again Stancill advanced on Andaya. After warning Stancill again to stop, Andaya fired four more bullets at close range. Andaya says that Stancill was still standing after the four shots were fired. Andaya does not remember anything else until he was lifted into an ambulance.

Jerry Stancill died from nine gunshot wounds: two to the head, five to the torso and one in each hand. The report of the doctor who examined Andaya the night of the shooting indicated that he had bruises on his arms, back, and legs, but not on his head. The medical report also indicated that Andaya's injuries were not serious.

*Hopkins, supra* at 883-884.

In reviewing whether Officer Andaya improperly used deadly force to subdue Mr. Stancill, the court of appeals held that even if Officer Andaya's story was true in all respects, he was not entitled as a matter of law to use deadly force on Mr. Stancill the second time because the circumstance of the case did not make it clear that deadly force was proportionate to the threat posed by Mr. Stancill at the time he was shot and killed by Officer Andaya.

This concept of proportionality has also been adopted in this jurisdiction by the Eleventh Circuit Court of Appeals in the case of *O'Neal v. DeKalb County, et al.*, 850 F.2d 653 (1988). In *O'Neal*, the survivors of a man killed in a police shootout brought a wrongful death suit under

42 U.S.C. Sec. 1983. The court of appeals' opinion provides the following factual background

for that case:

> On the evening of December 15, 1983, the decedent, George Washington O'Neal, Sr., a patient at Doctor's Hospital in DeKalb County, Georgia, went on a rampage through the hospital and stabbed seven people with a pocketknife. Officer Steven Waits, a DeKalb County police officer, arrived at the hospital in response to a police call. Waits, armed with his service revolver, found O'Neal on the second floor, holding a bloody knife. Waits identified himself as a police officer and ordered O'Neal to drop his knife. Ignoring Waits's demand, O'Neal ran away down the hallway. As Waits chased O'Neal through the second floor corridors, he observed "a lot of blood on the floor ... a piece of intral [sic] of some kind" and a person with a severe stomach wound lying on the floor. Deposition of Steven W. Waits, at 54. He also noticed that the nursing supervisor had a stab wound in his back. Police Report, Plaintiff's Exhibit 2.
>
> After Waits had chased O'Neal for approximately five minutes, Officer Rick Roseberry, armed with a shotgun, arrived at the hospital to assist Waits. Roseberry also saw "blood all over the floor" and walls and "a piece of human tissue lying there in [sic] the floor in front of me." Deposition of Rickie Emmit Roseberry, at 66. Soon after Roseberry's arrival, the two officers cornered O'Neal at the end of one of the second floor corridors so that O'Neal was standing only six feet from Roseberry and between five and six feet from Waits. With their weapons raised, the officers repeatedly ordered O'Neal to drop his knife and lie on the floor. Instead of complying, O'Neal rushed toward Roseberry with the knife raised over his head; in response, both officers fired their weapons at O'Neal. Although struck by both shots, O'Neal did not fall, but rather twisted around from the force of the shots, still waving his knife above his head. **Immediately after the first volley of shots, Roseberry fired a second shot, which hit O'Neal in the small of the back and brought him to the ground. O'Neal died as a result of the gunshot wounds.**

*Id.* at 654-655 (footnote omitted)(emphasis added).

The court of appeals ultimately concluded that the police were justified in shooting Mr.

O'Neal dead, but not before thoroughly analyzing whether Roseberry's second shot was

necessary and proportionate to the threat posed by Mr. O'Neal at the particular moment in time

at which it was fired. The court of appeals' analysis in this regard is as follows:

> Our opinion does not change because Roseberry fired a second shot at O'Neal. As the plaintiffs admitted in their brief and at oral argument, Roseberry fired his second shot "immediately" after his first, and at the time of the second shot,

O'Neal was still on his feet, holding his knife and spinning from the force of the first volley of shots. **These undisputed facts convince us that <u>Roseberry's second shot was part of his initial reaction</u> to O'Neal's attempt to stab him, and not, as the plaintiffs would have us believe, a brutal, gratuitous use of force against a visibly disabled suspect.** Viewed as part of his initial reaction to O'Neal's attack, and in light of the unusual circumstances facing the officers that evening, Roseberry's firing of two shots in rapid succession in an attempt to guarantee O'Neal's apprehension did not constitute excessive force.

*Id.* at 657. (footnotes omitted)(emphasis added).

Although the court of appeals rejected O'Neal's claims, its analysis in doing so makes it clear that if the second shot had been "a brutal, gratuitous use of force against a visibly disabled suspect", instead of the police officer's initial reaction to protect himself from imminent harm, the police officer would not have been immune from liability for his actions. In other words, the police are not free to simply blast away at a criminal suspect. Rather, the police's use of force must be sufficiently tailored to a particular situation such that it is reasonably proportionate to the threat of danger.

In Mr. Cliatt's case, common sense dictates that it does not take 57 rounds of gunfire to eliminate the threat of one man who had fired a single shot at the police and was laying on the ground with no way of escape. Despite having fired a shot at the officers, given the way he was boxed in and the number of officers and the weapons arrayed against him, Mr. Cliatt was not in a position to do real harm to all five officers. The amount of force (57 rounds!) used against Mr. Cliatt is the very definition of the "brutal, gratuitous use of force against a visibly disabled suspect."

## IV.  CONCLUSION

Given the circumstances surrounding Mr. Cliatt's death, it is perhaps understandable that it does not generate the outpouring of protest that one would normally expect to follow after police officers carry out what can only be described as a roadside execution. In fact, some

otherwise decent and law abiding people may actually applaud the police's action in this case, believing Mr. Cliatt got what he deserved.  However, that kind of reaction to Mr. Cliatt's bloody fate is quite simply wrong.  Moreover, it ignores the fact that the United States is a nation of laws that must be administered in a fair and even-handed manner, even toward those who have violated part of our society's social compact.

As repugnant as the idea may be to some, Mr. Cliatt's estate deserves justice.  Justice in this case requires that those who are responsible for the deprivation of Mr. Cliatt's civil and constitutional rights be held accountable.  This is true even if Mr. Cliatt himself committed a violent act shortly before his own death.  Holding the defendants in this case accountable for Mr. Cliatt's wrongful death will reaffirm the concepts of civil and constitutional rights, and equality under the law of *all* American citizens.  For all of these reasons, Mr. Cliatt's estate respectfully requests summary judgment on its claims against defendants pursuant to Fed. Rule Civ. Proc. 56(c).

**/s/ Fulton B. Eaglin**＿＿＿＿＿＿＿＿

Fulton B. Eaglin (P24834)
Attorney for Plaintiff
2610 East Arbor Road, Suite 100
Ann Arbor, MI  48103
(734) 665-5355; 0911fax
fbeaglin@aol.com
December 7, 2007

### CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to JOSHUA R. MC KOON, JAMES ROBERT MC KOON, JR., JAMES PAUL GRAHAM, JR., KENDRICK E. WEBB, SCOTT WAYNE GOSNELL.

/S/  Fulton B. Eaglin

Fulton B. Eaglin (P24834)
Attorney for Plaintiff
2610 East Arbor Road, Suite 100
Ann Arbor, MI  48103
(734) 665-5355; 0911fax
fbeaglin@aol.com