**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROSIE CLIATT, as Personal** | ) | |
| **Representative of the Estate of** | ) | |
| **DONTAVIUS CLIATT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:06-cv-471-SRW [WO]** |
| **v.** | ) | |
| | ) | |
| **PHENIX CITY, ALABAMA,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT MARK WELLS' BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT AND**
**RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendant Mark Wells (hereafter, "Deputy Wells" or the "Defendant") and submits his Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment. As grounds therefor, Defendant shows unto this Honorable Court the following:

1.    The evidence before the Court[1] does not support Plaintiff's claim for summary judgment; and

2.    The evidence before the Court clearly shows that Deputy Wells is entitled to qualified immunity.

---

[1] The Plaintiff has submitted ten (10) Exhibits in support of her Motion for Summary Judgment, the majority of which are unauthenticated documents kept in the normal course of law enforcement operations (i.e., police reports, autopsy report, etc.). The Defendant does not object to the admission of these official documents, and will rely on those very same documents in support of this Motion. Additionally, as a "response in kind," this Defendant will submit one further unauthenticated official document in support of his Motion, with the assumption that the Plaintiff will likewise not object or has waived any objection to the admission of such documents. Defendant reserves the right to object to Plaintiff's Exhibits 8 and 9, the affidavits of the Plaintiff and Plaintiff's counsel.

## STATEMENT OF UNDISPUTED FACTS[2]

On or about May 3, 2003, Dontavius Cliatt (hereafter, the "Decedent") evidently robbed and murdered a used car dealer in Phenix City, Alabama.  (Complaint, District Court of Russell County Warrant Number WP 2003 001216.00, dated May 12, 2003, attached herewith as Exhibit A and incorporated herein as if fully set forth; Russell County District Attorney Felony Intake & Charging Sheet Number 03PL12645, attached herewith as Exhibit B and incorporated herein as if fully set forth.)  At approximately 6:30 p.m. that evening, the Decedent, with his girlfriend Denise Williams, was driving south on Sandfort Road when they were passed by a Russell County Sheriff's Department patrol vehicle traveling in the opposite direction. (Memorandum of Interview of Denise Williams by Phenix City Investigator Michael Vargo dated May 4, 2003 (hereafter, the "Vargo Interview"), attached herewith as Exhibit C and incorporated herein as if fully set forth; Memorandum of Interview of Denise Williams by Phenix City Investigator Socrates Miles dated May 4, 2003 (hereafter, the "Miles Interview"), attached herewith as Exhibit D and incorporated herein as if fully set forth.)[3]  That patrol vehicle was driven by Deputy Wells.  At that time, the Decedent became nervous and pulled into a random  residential driveway and put his vehicle into park, hoping that Deputy Wells would not turn around.[4]  (Vargo Interview; Miles Interview; Russell

---

[2] This Statement of Facts, and all facts alleged in this Motion, are for purposes of this Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment only, and are not intended to constitute an admission of any fact alleged by the Plaintiff.

[3] It should be noted, and Plaintiff's counsel admits in his Motion for Summary Judgment, that Ms. Williams 'statement is highly suspect, and contains several inconsistencies.  (Doc. 75, p. 4.)  At one point in her interview, Ms. Williams denies having been present at the used car lot when her boyfriend robbed and murdered the owner of the lot, and even denied any knowledge of the event.  (Vargo Interview; Miles Interview.)  However, during the same interview she later stated that she would be truthful, and admitted being present (on the bt) while her boyfriend committed the murder, and had firsthand knowledge of it.  Id.

[4] The exact address was 2814 Sandfort Road, Phenix City, Alabama.  (Alabama Certificate of Death for Dontavious Lamar Cliatt dated May 20, 2003; Miles Interview.)

County Sheriff's Department LAW Incident Table (hereafter, "Sheriff's Report"), attached herewith as Exhibit E and incorporated herein as if fully set forth.)  Upon seeing the Decedent's vehicle pull into the driveway, Deputy Wells turned his vehicle around and pulled in directly behind the Decedent's vehicle.  (Vargo Interview; Miles Interview.)

Upon exiting his car, Deputy Wells approached the driver's side of the vehicle and asked the Decedent for his driver's license and other documentation.[5]  (Vargo Interview; Miles Interview.) When the Decedent could not produce either a driver's license or other documentation, Deputy Wells returned to his car and radioed 911 dispatch to run the Decedent's status.[6]  (Vargo Interview; Miles Interview; Report from Phenix City Police Captain J. Hart to Phenix City Police Chief P. Robinson dated May 23, 2003 (hereafter, "Hart Report"), attached herewith as Exhibit F and incorporated herein as if fully set forth.[7])  Deputy Wells was advised by dispatch that the Decedent and his vehicle matched the description of a suspect and vehicle involved in the robbery and murder committed earlier that day.  (Hart Report.)  Consequently, Deputy Wells requested backup assistance, and immediately drew his Heckler & Koch 9mm firearm to "cover" the Decedent. (Vargo Interview; Miles Interview; Sheriff's Report.)  The following Phenix City police officers

---

[5] Although Ms. Williams' statement is that Deputy Wells asked for the Decedent's driver's license and automobile registration, this is likely an innocent mistake; standard procedure for Alabama law enforcement officers is to ask for a driver's license and proof of insurance.

[6] Though the evidence does not indicate what information Deputy Wells provided to dispatch to run the Decedent's status, it is common for law enforcement officials to run an individual by name and date of birth, particularly when the individual does not present a driver's license.  Further, Ms. Williams indicated in her statement that Deputy Wells "walked to the rear of their vehicle."  (Williams Statement.)  Therefore, it is reasonable to assume that Deputy Wells could have run the Decedent's status from the vehicle registration (license tag) of his vehicle.

[7] The Hart Report is an internal memorandum consisting of interview statements of all five (5) Phenix City involved in the incident, along with conclusions and recommendations associated with those statements.  The stated purpose of the Report is "to determine if proper procedure(s) was followed by the involved officers of the PCPD [e.g. the Phenix City Police Department]."  (Hart Report.)  It is very important to note that this document is strictly confined to the Phenix City Police Department, and reflects the statements of only the PCPD officers and policies.  Deputy Wells, a Russell County Sheriff's Deputy, was not interviewed for this Report, and Russell County Sheriff's Department policies and procedures were not reflected or represented.

arrived at approximately the same time in response to Deputy Wells' request for assistance: Lieutenant Patrick Daughtry, Corporal Jarrod Barr, Corporal David Reeves, Officer Chris Brennan, and Officer Darius Farley (collectively, the "PC Officers").[8]  (Hart Report.)  Upon their arrival, these officers also immediately drew their .40 caliber firearms and pointed them at the Decedent's vehicle.  (Vargo Interview; Miles Interview.)  At that time, the Decedent reached under his seat and retrieved a Smith & Wesson 9mm pistol, stating "I'm not going out like that!"[9]  (Vargo Interview; Miles Interview; Department of Forensic Sciences Firearms Examination/Laboratory Report dated July 30, 2003 (hereafter, "DFS Firearms Report"), attached herewith as Exhibit G and incorporated herein as if fully set forth at p. 3.)

Corporal Barr and Officer Brennan began to approach the Decedent's vehicle, while Deputy Wells, Officer Farley, Corporal Barr and Officer Brennan all verbally instructed the Decedent to place his hands out the window.[10]  (Hart Report.)  The Decedent did not comply or verbally respond, but instead rapidly exited his vehicle and either aimed his pistol at Corporal Barr or immediately began firing at the officers with his pistol.[11]  (Hart Report; Sheriff's Report.)  At that time, some or all officers fired at the Decedent, causing the Decedent to fall to the ground.  (Vargo Interview; Miles Interview; Hart Report; Sheriff's Report.)  Deputy Wells fired his 9mm pistol nine

---

[8]  This resulted in at least six law enforcement officers (Deputy Wells and the five PC Officers) and four patrol cars (Deputy Wells's vehicle and three PC vehicles) at the scene.  (Sheriff's Report.)  Though the Plaintiff, in her Motion for Summary Judgment, makes several references to a SWAT team, there is no evidence in the record to support that a SWAT team was ever requested, dispatched or employed in this incident.  (Doc. 75, p. 7.)

[9]  Officer Brennan stated that he observed the Decedent apparently fumbling with something in the car.  (Hart Report.)

[10]  The Plaintiff, in her Motion for Summary Judgment, states that at least five law enforcement officers approached the Decedents car.  (Doc. 75, p. 7.)  However, only two officers state that they initially approached the vehicle.  (Hart Report.)

[11]  Plaintiff, in her Motion for Summary Judgment, assumes that the Decedent fired at the officers first.  (Doc. 75, p. 7.)  The testimony of the various officers disagree on this point.  However, they all agree that the Decedent, at a minimum, threatened them with his handgun prior to the defendants firing on him.

times, but failed to hit the Decedent.  (DFS Firearms Report at pp. 10-11, 13-14.)  The Decedent was shot seven (7) times by .40 caliber bullets.  (Department of Forensic Sciences Report of Autopsy dated May 5, 2003, attached herewith as Exhibit I and incorporated herein as if fully set forth; Sheriff's Report; DFS Firearms Report at pp. 13-14.)  Regardless of whether he fired first or not, the Decedent did fire his weapon; apparently while the Decedent was firing his pistol, one of the fired cartridge cases failed to properly extract from the chamber of the pistol, and remained partially in the pistol's chamber, causing what is commonly known as a "malfunction," or "jam." (DFS Firearms Report at p. 3.)  This jam rendered the weapon unable to fire the remaining seven (7) 9mm bullets remaining in the gun.  Id. at p. 4.  Deputy Wells and the PC Officers approached the Decedent as he was lying prone on the ground face up, and observed the Decedent attempting to reach for his pistol lying nearby.[12]  (Hart Report.)  Lieutenant Daughtry retrieved the Decedent's pistol, and Officer Brennan, with the assistance of Officer Farley, secured the Decedent in handcuffs.  (Hart Report.)  During this time, Corporal Reeves took Ms. Williams into custody. (Hart Report.)

The Decedent died on the scene from multiple gunshot wounds.  (Alabama Certificate of Death of Dontavious Lamar Cliatt dated May 20, 2003, attached herewith as Exhibit H and incorporated herein as if fully set forth; Department of Forensic Sciences Report of Autopsy dated May 5, 2003.)  All of those wounds were caused by .40 caliber bullets.  (DFS Firearms Report at pp. 13-14.)[13]

---

[12]  Presumably the Decedent dropped his pistol as he fell.

[13]  Plaintiff, in her Motion for Summary Judgment, concedes that "the five officers fired 57 rounds back at Mr. Cliatt and killed him," and that "five officers [] were involved in killing Mr. Cliatt."  (Doc. 75, pp. 7, 11.)  Inasmuch as there were at least six officers on the scene, by referencing five officers, Plaintiff is conceding that at least one officer did not shoot and kill the Decedent.

## PROCEDURAL HISTORY

The Plaintiff filed her Complaint on May 25, 2006, initially naming the City of Phenix City and Preston Robinson as the only named defendants.[14]  (Doc. 1.)    On September 27, 2006, Magistrate Judge Susan Russ Walker issued her (Amended) Scheduling Order.[15]  (Doc. 20.)  On December 6, 2006, the Plaintiff filed her Amended Complaint (First), naming as additional defendants several Phenix City police officers, as well as Russell County Sheriff's Deputy Mark Wells.[16]  (Doc. 35.)  That Amended Complaint contained three (3) causes of action:  a § 1983 action against the City of Phenix City and individual defendants in their official capacities, a § 1983 action against defendant Preston Robinson, and a § 1983 action against the individual defendants in their individual capacities.   (Doc. 35.)   On December 14, 2006, the Plaintiff filed her Amended Complaint (Second), amending and correcting her Complaint, but without adding any additional defendants or any additional causes of action.  (Doc. 38.)  On February 26, 2007, defendant Deputy Wells filed his Motion to Dismiss and Brief in support thereof, on the grounds that, *inter alia*, Deputy Wells, in his official capacity, is entitled to immunity pursuant to the Eleventh Amendment to the United States Constitution, Deputy Wells is not a "person" for purposes of § 1983, and because Deputy Wells in entitled to qualified immunity.  (Doc. 54, pp.1-2.)  On March 30, 2007, this Court vacated the Amended Scheduling Order.  (Doc. 68.)  On December 7, 2007, the Plaintiff filed her Motion for Summary Judgment, along with her Brief in support thereof and evidentiary submissions.  (Docs. 74-76.)

---

[14]  This initial Complaint also listed several fictitious Phenix City police officers as additional defendants.

[15]  The original Scheduling Order was issued by Magistrate Judge Walker on September 14, 2006.  (Doc. 16.)

[16]  The Plaintiff, in her Amended Complaint (First), also named Russell County Reserve Deputy Eric Fetty as a defendant; however, Deputy Fetty has to date not yet been served, and this Court has indicated its intention to dismiss Deputy Fetty from this action on January 4, 2008.

On December 12, 2007, this Court issued its Order granting in part and denying in part Deputy Wells' Motion to Dismiss.  (Doc. 77.)  In its Order, this Court dismissed the official capacity claim against Deputy Wells, but denied Deputy Wells' claim to qualified immunity.[17]  Id.

## SUMMARY JUDGMENT STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex, 477 U.S. at 327.

---

[17] In its opinion, this Court found that Deputy Wells was mentioned in two different counts of the Plaintiff's three-count Complaint.  (Doc. 77, p. 4.)  This Court construed Count I to be a claim against Deputy Wells in his official capacity, and Count III to be a claim against Deputy Wells in his individual capacity.  (Doc. 77, p. 5.)

> Looking at the Complaint, Wells is mentioned in two different counts.  Count I states that it is brought against Phenix City, as well as several officials including Wells, based upon the "policies" and "practices" of the city and county themselves, as well as the officials.  Count III states that it is brought against several officials "Individually," and bases liability on the officials' actions "under the color of law."

> . . . Therefore, because Count I bases liability on the policies and practices of a government entity, this Court finds that Wells is being sued in that count in his official capacity.  On the other hand, Count III, which bases liability on Wells' actions "under color of law" and states that he is being sued "Individually," is a claim against Wells in his personal capacity.

> Because deputy sheriff's [sic] are immune from suit in their official capacities pursuant to the Eleventh Amendment . . . all claims against Wells in his official capacity must be dismissed.  This means that Count I is dismissed to the extent that it purports to state a claim against Wells in his official capacity.  However, the claim against Wells in Count III, which is a claim against Wells in his personal capacity, will not be dismissed.

(Doc. 77, p. 4-6) (citations omitted).  It should be noted that this Court did not dismiss Count I in its entirety due to the fact that it remains as to "all other defendants."  (Doc. 77, p. 5, n. 1.)  Further, Count II is a claim solely against the City of Phenix City.

On a motion for summary judgment, the court should view the evidence in the light most favorable to the non-movant. Greason v Kemp, 891 F.2d 829, 831 (11th Cir. 1990). However, a plaintiff "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Only reasonable inferences with a foundation in the record inure to the non-movant's benefit. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000). "[T]he court should give credence to the evidence favoring the non-movant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Id. (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299).[18] "A reviewing court need not 'swallow plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited.'" Marsh v. Butler County, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc) (quoting Mass. School of Law v. American Bar, 142 F.3d 26, 40 (1st Cir. 1998)).

Deputy Wells is entitled to judgment in his favor as a matter of law on the Plaintiff's remaining claim because he is entitled to qualified immunity. Once a defendant has asserted the defense of qualified immunity, the threshold inquiry a court must undertake is whether the plaintiff's allegations, if true, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). This initial inquiry is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The second inquiry is, if a constitutional violation is

---

[18] Although Reeves was a review of a motion for judgment as a matter of law after the underlying matter had been tried, the Supreme Court, in determining the proper standard of review relied heavily on the standard for summary judgment stating, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" Reeves, 530 U.S. at 150, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

stated, were these rights "clearly established" to the degree that Deputy Wells had "fair warning" that his conduct violated the Plaintiff's constitutional rights? <u>Willingham v. Loughnan</u>, 321 F.3d 1299, 1301 (11th Cir. 2003).

In making an assessment of whether the particular conduct of Deputy Wells was clearly established as being violative of constitutional dictates, the reviewing court must examine the state of law at the time the alleged deprivation occurred. <u>See</u> <u>Rodgers v. Horsley</u>, 39 F.3d 308, 311 (11th Cir. 1994). A constitutional right is clearly established only if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987); <u>Lancaster v. Monroe County</u>, 116 F.3d 1419, 1424 (11th Cir. 1998). "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." <u>Jenkins v. Talladega Bd. of Educ.</u>, 115 F.3d 821, 827 (11th Cir. 1997) (en banc) (citations omitted).

Deputy Wells is entitled to qualified immunity for two reasons. First, the Plaintiff cannot meet his burden of showing a constitutional violation. Second, even if the evidence in the record did show a constitutional violation, the Plaintiff cannot point to any contemporaneous clearly established law that provided Defendant with "fair warning" that his conduct was illegal.[19]

## ARGUMENT

Qualified immunity is a protection designed to allow government officials to avoid the expense and disruption of trial. <u>Ansley v. Heinrich</u>, 925 F.2d 1339, 1345 (11th Cir. 1991). The Eleventh Circuit Court of Appeals has observed, "[t]hat qualified immunity protects governmental

---

[19]  The first step in a qualified immunity analysis is, of course, a showing by the defendant that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. <u>Crosby v. Monroe County</u>, 394 F.3d 1328, 1332 (11th Cir. 2004). However, this Court has already found that "Wells was performing a

actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their *individual capacities*." Lassiter v. Alabama A & M Univ., 28 F.3d 1146 (11th Cir. 1994) (en banc) (emphasis in original) (footnote omitted).  In the light of pre-existing law the unlawfulness must be apparent.  Anderson v. Creighton, 483 U.S. 635, 640 (1987). Mere statements of broad legal truisms, without more, are not sufficient to overcome qualified immunity.  Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993).

Once a defendant has asserted the defense of qualified immunity, the threshold inquiry a court must undertake is whether the plaintiff's allegations, if true, establish a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  This initial inquiry is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The second inquiry is, if a constitutional violation is stated, were these rights "clearly established" to the degree that the defendant had "fair warning" that his/her conduct violated the plaintiff's constitutional rights?  Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003).

In making an assessment of whether the particular conduct of this Defendant was clearly established as being violative of constitutional dictates, the reviewing court must examine the state of law at the time the alleged deprivation occurred.  See Rodgers v. Horsley, 39 F.3d 308, 311 (11th Cir. 1994).  A constitutional right is clearly established only if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987); Lancaster v. Monroe County, 116 F.3d 1419, 1424 (11th Cir. 1997).  "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the

---

discretionary function because making an arrest is within the official responsibilities of a sheriff's deputy."  (Doc.

state where the case arose." Jenkins v. Talladega Bd. of Educ., 115 F.3d 821, 827 (11th Cir. 1997) (en banc) (citations omitted).

In her Motion for Summary Judgment, the Plaintiff alleges that Deputy Wells employed excessive force against the Decedent, resulting in his death, in violation of his Fourth and Fourteenth Amendment rights (Doc. 38, pp. 39, 40 and 42). Plaintiff's Motion is due to be denied because the facts in the record do not establish that Deputy Wells violated the Decedent's constitutional rights, or that established law put Deputy Wells on notice that his actions were unconstitutional. To the contrary, the undisputed facts clearly establish that Deputy Wells did not violate the Decedent's constitutional rights in any fashion.

## I.   DEPUTY WELLS DID NOT VIOLATE THE DECEDENT'S CONSTITUTIONAL RIGHTS.

As Plaintiff admits, the Decedent did not have a constitutional right to be absolutely free from the use of any force when being detained and arrested as a suspect for murder. The Supreme Court has established that, in order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights, a court must evaluate a number of factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386 (1989).

In her Motion for Summary Judgment, the Plaintiff alleges that Deputy Wells used excessive force on the Decedent in two respects. First, the Plaintiff alleges that Deputy Wells, along with the other defendant officers, "created a situation so tense and so dangerous that it ultimately provoked [the Decedent] into taking violent action against them." Additionally, the Plaintiff alleges that Deputy Wells used *proportionately* excessive force against the Decedent.

77, p. 7.)

11

The gist of the Plaintiff's second argument seems to be that even if the Defendants were constitutionally authorized to use lethal force against the Decedent, fifty-seven rounds was *too* lethal, and therefore unduly punished the Decedent in addition to killing him. (See, Doc. 75, p. 2.)

A.    **Deputy Wells Did Not Provoke The Decedent**

The Plaintiff argues that the police officers cornered the Decedent, thereby offering him no reasonable alternatives and provoking him to violence. However, it is undisputed that the Decedent chose to turn into the driveway and park where he did; he was not ordered to stop there. In fact, Deputy Wells did not even turn around and park behind the Decedent until the Decedent had already parked his car. Further, after ascertaining that the Decedent was a murder suspect, Deputy Wells did not approach the car, but instead ordered the Decedent to put his hands outside the car window. Therefore, even if the officers approaching the car could be stretched into provocation, Deputy Wells did not participate in that action, and cannot be held to have contributed to the provocation.

The Decedent chose to resist arrest, as evidenced by his statement that he was not going to "go out like this." That was his choice, and it was a meaningful one. He had other options, such as obeying instructions to place his hands outside the car window, and allowing himself to be taken into custody. Instead, he chose to engage in a gunfight with the Defendants, at which point the Defendants fired back. However, the evidence in the record shows that after the Decedent fell to the ground, the Defendants quit firing their weapons. In fact, even when the Decedent continued reaching for his gun, the defendants did not fire upon him; Lieutenant Daughtry merely retrieved the Decedent's gun. There is no evidence in the record that the defendants fired on the Decedent after he fell to the ground.

Plaintiff's reliance on Gilmere v. City of Atlanta, 774 F.2d 1495 (11th Cir. 1985) (overruled on other grounds) is misplaced, inasmuch as the facts in that case are dramatically different. In Gilmere, it is important to note that the decedent resisted arrest while he was being escorted, and the police officers were beating him on his head. Id. at 1497. The summary statement by the Court of Appeals is sufficient to demonstrate the dissimilarity:

> . . . [T]he police had little cause to believe [the decedent] himself to be dangerous. Given his small size, intoxicated state, and *lack of a weapon*, he clearly posed little threat to their safety when they initially began escorting him to the patrol car. Finally, as we have pointed out in Section A above, the district court's findings of fact establish that [the decedent] did little to provoke the police officers to beat him. That unwarranted intrusion, as well as the unwarranted shooting which directly resulted from his efforts to escape the officers' further physical abuse, give grounds for relief under the fourth amendment.

Gilmere, 774 F. 2d at 1502.

Unlike Gilmere, and as this Court has recognized, in the case at bar the officers had every reason to believe that the Decedent was dangerous; he was a robbery/murder suspect! He had a weapon, and was at the very least brandishing it towards the officers, at the very most firing on the officers. That certainly constitutes provocation under any standard. Finally, the Defendants here had offered no abuse to the Decedent. At the point when the Decedent exited the car and began firing on them, the officers had not laid hands on him, had not threatened him, and had taken no provocative action towards him other than drawing their firearms (a sensible precaution) and telling him to put his hands out the car window. Apparently the Plaintiff thinks it unreasonable for a law enforcement officer to draw his firearm when confronting and attempting to arrest a murder suspect. However, there is no legal authority for that position.

**B.    Deputy Wells Did Not Use Excessive Force.**

Initially, it should be pointed out that the evidence is conclusive that Deputy Wells did not fire any of the shots that struck and killed the Decedent. The Alabama Department of Forensic Sciences investigations and reports are clear that the Decedent was shot seven times, all with .40 caliber bullets. (Department of Forensic Sciences Report of Autopsy dated May 5, 2003; DFS Firearms Report at pp. 13-14.) The only individuals shooting .40 caliber bullets on the scene were the Phenix City defendants. Deputy Wells was shooting a Heckler and Koch *9mm* pistol. (DFS Firearms Report at pp. 10-11.) Thus, the evidence is clear and undisputed that Deputy Wells did not shoot the Decedent, and therefore cannot be guilty of excessive force against him.

Nevertheless, out of an abundance of caution, it is equally clear that even though Deputy Wells fired his pistol, he did not exercise excessive force against the Decedent. The test for determining whether an officer has applied excessive force in the course of seizing a person is the "objective reasonableness" test. Graham v. Connor, 490 U.S. 386, 395 (1989). Whether a specific use of force is objectively reasonable turns on several factors including the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing. Graham, 490 U.S. at 394; Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993). The Eleventh and Third Circuit Courts of Appeal have also considered "other relevant factors including the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of affecting an arrest, the possibility that the suspect may be armed, and the number of persons with who the police officers must contend at one time." Crosby v. Paulk, 187 F.3d 1339, 1351 (11th Cir. 1999) (quoting Sharrar v. Felsing, 128 F.3d 810, 822 (3rd Cir. 1997).

"In analyzing whether excessive force was used, courts must look at the totality of the circumstances." <u>Garrett v. Athens-Clarke County</u>, 378 F.3d 1274, 1280 (11th Cir. 2004). "We must look at the situation not with hindsight, but with the eye of the objectively reasonable officer on the scene." <u>Garrett</u>, 378 F.3d at 1281. Generally, the actions of the officer must be reasonable in light of the facts and circumstances confronting the officer, without regard to his underlying intent or motivation. <u>Graham</u>, 490 U.S. at 397. The Eleventh Circuit has added "[w]e must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction would prove fatal." <u>Crosby v. Monroe County</u>, 394 F.3d 1328, 1333-34 (11th Cir. 2004).

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.

<u>Graham</u>, 490 U.S. at 396-97. <u>See also</u>, <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1267-68 (11th Cir. 2003).

The United States Supreme Court has held that the courts are "loath to second-guess the decisions made by police officers in the field." <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1331 (11th Cir. 2003); <u>Graham v. Connor</u>, 490 U.S. 386, 396-97 (1989). This reluctance to second-guess the decisions of police officers is wise, in that it permits those officers to better protect themselves and the public without unnecessary concern for personal liability from frivolous lawsuits such as this one. "Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer." <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1270 (11th Cir. 2003) (citation omitted). "We must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized

world of our imagination to replace the dangerous and complex world that policemen face every day." Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992). "The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." Elliott v. Leavitt, 99 F.3d 640, 641 (4th Cir. 1996).

### 1.    The severity of the Decedent's crimes justified the force used.

The first precondition for the use of deadly force, as articulated by Graham, is a consideration of the severity of the crime at issue. In the case at bar, Deputy Wells had reliable information from a trustworthy source that the Decedent was suspected of committing a murder which had occurred earlier that day. Further, at the time he was shot, the Decedent was brandishing a gun and directing it towards the defendant officers – possibly even actively shooting at them! The undisputed facts also indicate that the Decedent had determined to fire upon the arresting officers and, in fact, did discharge his weapon at some point. Certainly this constituted sufficiently severe crimes to justify the application of deadly force.

The Decedent added to his previous crimes by committing attempted murder of each of the deputies and officers present in that he fired or, at a minimum, brandished his pistol at the officers as they attempted to take him into custody, and at a maximum, actually fired his pistol at the arresting officers. Ala. Code §§ 13A-4-2, 13A-6-2.

### 2.    The Decedent posed a severe and immediate threat to the officers present.

The second precondition for the use of deadly force, as articulated by Graham, is that the officer must have probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, or that he has committed a crime involving the infliction or threatened infliction of serious physical harm. There can be no question that the Decedent posed a severe and immediate threat to the defendant officers. The Decedent was obviously armed, inasmuch as he fired upon the defendant police officers. Further, even if you accept the

Plaintiff's contention that the officers fired on the Decedent before he exited the car, it is undisputed that the Decedent was in possession of his 9mm pistol when the officers approached his vehicle. "[A]n officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force." Montoute v. Carr, 114 F.3d 181, 185 (11th Cir. 1997).

Given the foregoing facts, Deputy Wells had every reason to believe that the situation was very serious indeed. Those factors also argue strongly in favor of Deputy Wells' conclusion that the Decedent posed an immediate threat to him, to the other officers, and possibly the other occupant of the vehicle. As this Court has already determined, this "condition is met because Decedent was suspected of homicide, which is a crime involving the infliction of serious physical harm." (Doc. 77, p. 8.)

### 3. The Decedent was resisting arrest.

The third precondition for the use of deadly force, as articulated by Graham, is whether the suspect was actively resisting arrest or attempting to evade arrest by flight. It is clear by the evidence that the Decedent was attempting to actively resist arrest or evade arrest. He initially pulled into the residential driveway on Sandifer Road in an attempt to avoid being stopped by a passing deputy sheriff's patrol vehicle. Further, upon being ordered to place his hands outside the car window, he instead made the choice "not to go out like this," but to instead retrieve a handgun and exit his car, gun blazing. There can be no better definition of actively resisting arrest.

Alabama law provides that officers may use reasonable force to effectuate an arrest or prevent escape. Ala. Code § 13A-3-27(a). Deadly force is authorized to effectuate an arrest or prevent an escape of a felon and to defend against the imminent use of deadly physical force.

<u>Ala. Code</u> § 13A-3-27(b).[20]  Clearly, this final use of force by Deputy Wells was justified in light of the threat Decedent posed to all of the defendant officers.  Given the crimes committed and the crimes in progress at the moment Deputy Wells fired, he was justified in doing so under Alabama law.

### 4.    The Garner test.

The Supreme Court's decision in <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985) was limited by the recent decision by the United States Supreme Court in <u>Scott v. Harris</u>, 127 S. Ct. 1769, 1777 (2007) ("<u>Garner</u> was simply an application of the Fourth Amendment's "reasonableness" test, to the use of a particular type of force in a particular situation.")  <u>See also</u>, <u>Long v. Slaton</u>, No. 06-14439, 2007 WL 3407680, *6 (11th Cir. Nov. 16, 2007); <u>Beshers v. Harrison</u>, 495 F.3d 1260, 1267 (11th Cir. 2007).  Assuming the facts in the case at bar are determined to be sufficiently similar to the facts in <u>Garner</u>, the <u>Garner</u> requirements were satisfied.

First, as outlined above, the Decedent was both a threat to the officers and had committed a crime ***that very day*** involving the infliction or lethal force on an innocent victim.  Clearly, the first element of <u>Garner</u> is satisfied.  Second, deadly force was necessary to apprehend the Decedent, and to prevent the Decedent from inflicting deadly force on the arresting officers.  Third, it simply was not feasible to give a warning.  A warning is not always required before using deadly force.  <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1269 n.20 (11th Cir. 2003).  The Decedent already had his gun out and had possibly already fired it at the officers.  Giving a

---

[20] That Code section provides, in relevant part, as follows:

    (b)  A peace officer is justified in using deadly physical force upon another person when and to the extent that he reasonably believes it necessary in order:

        (1)  To make an arrest for a felony or to prevent the escape from custody of a person arrested for a felony, unless the officer knows that the arrest is unauthorized; or

        (2)  To defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force.

<u>Ala. Code</u> (1975) § 13A-3-27(b)

warning to the Decedent could very well have resulted in the Decedent shooting and possibly killing Deputy Wells or another officer while Deputy Wells was attempting to issue the warning.

Furthermore, as demonstrated by his attacks on law enforcement, the Decedent was not likely to heed such a warning. In fact, prior to the shooting, Deputy Wells had yelled to the Decedent to put his hands out the window. Further, the Decedent had already appreciated the situation, inasmuch as he indicated to Ms. Williams that he was not going to "go out like that." He was obviously well aware that his refusal to submit to the lawful orders of the arresting officers could result in his demise. Consequently, any warning would have been futile.

Each element of justification for using deadly force on a fleeing felon under <u>Garner</u> is indisputably present in this case. Accordingly, Deputy Wells did not violate the Decedent's rights by using deadly force.

### 5. Deputy Wells never "seized" the Decedent; therefore, Wells cannot be charged with excessive force.

The undisputed fact that no bullet from Deputy Wells' gun struck the decedent (and that he otherwise had no physical contact with the decedent) means that the decedent was never "seized" the decedent and therefore Deputy Wells cannot, as a matter of law, be charged with a Fourth or Fourteenth Amendment violation for excessive force. <u>Compare with Carr v. Tatangelo</u>, 338 F.3d 1259, 1268 (11th Cir. 2003) ("Although Carr was not immediately stopped by the bullet from Officer Fortson's gun, he nevertheless was seized within the meaning of the Fourth Amendment *when the bullet struck or contacted him.*") (Emphasis added).

### 6. Plaintiff's burden.

On a motion for summary judgment, the plaintiff has the burden to identify substantial evidence of a genuine issue of material fact:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as

> otherwise specified in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). "A police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred." Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000). To defeat this summary judgment motion, the plaintiff must produce substantial evidence that Deputy Wells could not have believed that his actions were lawful. That is an insurmountable burden.

The Plaintiff places a great deal of weight on two statements contained in Captain Hart's After Action Report to support her Motion for Summary Judgment.[21] However, that report specifically finds that the officers involved were justified in utilizing deadly force.

> . . . In this incident, all five city officers were confronted by an armed assailant. In addition, the assailant was believed (by each officer) to have been involved in a recent (two hours earlier) robbery/homicide. Though there is some confusion as to who fired the initial shot (assailant or officers), there is no dispute that the assailant presented a firearm at/towards the officers. The aforementioned subsection [the police department's use of force policy SOP A-16] ". . . protect the police officers or others from what is reasonably believed to be an immediate threat of death or serious bodily harm" is applicable as the presentation of a pistol by the offender could definitely lead to death or serious bodily harm.

> The use of force continuum covered by SOP A-16-A was also adhered to by the involved officers. The policy states that the use of deadly resistive force against an officer is to be combated by any tactic necessary to ensure officer survival.

> . . .

> I find all five PCPD officers acted within the department's guidelines/SOP with reference to the use of deadly force and, therefor, recommend no disciplinary action be taken.

(Hart Report.)[22]

---

[21] It should again be noted that this report, though enlightening, by its terms does not apply to Deputy Wells.

[22] Captain Hart's critique of his Phenix City officers' performance was limited to their failure to follow their chain of command, and their need for additional training on felony/high risk take-downs/arrests. (Hart Report.)

This is not merely a case in which the Plaintiff has failed to identify evidence sufficient to create a question of fact.  In this case, Deputy Wells has affirmatively proven that his actions were justified.

The Plaintiff's reliance on <u>Hopkins v. Andaya, et al.</u>, 958 F.2d 881 (9th Cir. 1992) (overruled on other grounds) is misplaced, for the simple reason that Ninth Circuit law cannot be considered clearly established law for purposes of qualified immunity.[23]  Further, the court in <u>Hopkins</u> never held that the number of rounds fired was improper (the basis for the Plaintiff's claim in the case at bar), but rather held that the circumstances giving rise to the shooting in the first place (i.e. the threat level of the suspect) did not rise to the level of requiring lethal force.  Therefore, in addition to not establishing law for the defendants, <u>Hopkins</u> is inapposite to the case at bar.

Plaintiff's reliance on <u>O'Neal v. DeKalb County</u>, 850 F.2d 653 (11th Cir. 1988) (overruled on other grounds) is also misplaced, in that it actually supports Deputy Wells' argument.  In <u>O'Neal</u>, the decent went on a rampage through a hospital, stabbing several people with a pocketknife.  <u>Id.</u> at 654.  Two police officers confronted the decedent and ordered him to drop his knife and lie on the floor.  <u>Id.</u> at 655.  Instead, the decedent rushed one of the officers with the knife raised above his head.  <u>Id.</u>  Both officers shot the decedent, hitting the decedent, and then one of the officers fired a second shot.  <u>Id.</u>  The decedent's estate brought a § 1983 action against the officers, various governmental officials, and the county, alleging excessive force.  <u>Id.</u>  Particularly, the plaintiffs argued, *inter alia*, that the second round of gunfire was excessive.  <u>Id.</u> at 656.  The Eleventh Circuit rejected that argument, holding that because the second shot was fired immediately after the first round, and because the decedent was still on his

---

[23] "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."  <u>Jenkins v. Talladega Bd. of Educ.</u>, 115 F.3d 821, 827 (11th Cir. 1997) (en banc) (citations omitted).

feet holding a knife, the second shot was part of the officers' initial reaction to the decedent's attempts to stab him, and not a "brutal, gratuitous use of force against a visibly disabled suspect." Id. at 657.

> [The defendant officers] used deadly force to protect themselves and the people at the hospital from O'Neal, who was armed and, as the blood-covered floors and injured bodies demonstrated, extremely dangerous. Considering the trying circumstances that the officers faced, their reaction, including [the officers'] second shot, was reasonable and hence within the bounds of the fourth amendment.

O'Neal, 850 F.2d at 658.

### 5. No constitutional violation – summation.

"The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." Elliott v. Leavitt, 99 F.3d 640, 641 (4th Cir. 1996). In situations such as the one Deputy Wells found himself in, law enforcement officials are not constitutionally required or taught to "shoot to wound," or to shoot the gun out of his hand, *a la* Hollywood. Deputy Wells' decision to shoot to kill was reasonable in light of the threat posed by the Decedent to Deputy Wells and the other responding officers.

The undisputed facts show that the Decedent *violently* and *savagely* resisted arrest. Under Graham, the use of force by Deputy Wells was objectively and unquestionably reasonable. As the record does not show a constitutional violation, the Plaintiff cannot meet her burden under Saucier to show that the conduct of this Defendant violated the Decedent's federally protected rights. Accordingly, Deputy Wells is entitled to qualified immunity and judgment in his favor as a matter of law.

### C. No Clearly Established Law Provided Deputy Wells With Fair Warning That His Conduct Was Unlawful.

Even if the Plaintiff could put forth some evidence that Deputy Wells violated the Decedent's rights, she still cannot show that Deputy Wells had fair warning that his conduct was

unlawful.  The Plaintiff must show that clearly established law provided Deputy Wells with fair warning that his conduct was unlawful by either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or federal constitutional provision are specific enough to demonstrate conduct was illegal, even in the total absence of case law.  <u>Storck v. City of Coral Springs</u>, 354 F.3d 1307, 1317 (11th Cir. 2003) (citations omitted).  The Eleventh Circuit has identified the latter method as an "obvious clarity" case.  <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted).  In order to show that the Deputy Wells' conduct was unconstitutional with "obvious clarity," "the unlawfulness must have been apparent."  <u>Willingham</u>, 321 F.3d at 1301.  "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit."  <u>Storck</u>, 354 F.3d at 1318 (quoting 28 F.3d at 1149).

Under these facts, it is simply not possible that this case could be one suitable to obvious clarity analysis.  In fact, the United States Supreme Court has stated that "this area [excessive force] is one in which the result depends very much on the facts of each case."  <u>Brousseau</u>, 543 U.S. at 201.  Accordingly, the case at bar is not an obvious clarity case.

After a diligent search of the relevant case law, counsel for this Defendant has been unable to find a case involving materially similar facts that held conduct similar to the undisputed conduct in the record to be unlawful.  To the contrary, the existing case law upholds the conduct of Deputy Wells.  <u>See</u>, <u>e.g.</u>, <u>Brousseau</u>, 543 U.S. at 201; <u>Arrugueta</u>, 415 F.3d at 1256; <u>Troupe</u>, 419 F.3d at 1168; <u>Draper</u>, 369 F.3d at 1278; <u>Elliott</u>, 99 F.3d at 645.  Consequently, the Plaintiff has the burden of either identifying such a case or proving that the conduct of Deputy Wells was obviously illegal.

As set forth above, Deputy Wells had probable cause to believe that the Decedent had committed a homicide earlier that day, and thus posed a threat of serious physical harm to the Defendant, the other officers, the passenger in the car, and the public at large. It is undisputed that the Decedent was suspected of murder, and that suspicion is the very reason that the Decedent was detained. It is undisputed that the Decedent was armed. It is undisputed, that he fired upon the Defendants. The Plaintiff alleges that the officers shot first, and that the Decedent only returned fire. However, nothing in any relevant legal precedent requires the defendant officers to allow a suspect to shoot first before employing deadly force. Therefore, under the relevant legal authority establishing the law in this area Deputy Wells had no notice that using deadly force on the Decedent would be an unconstitutional act. Accordingly, Deputy Wells is entitled to qualified immunity, and the Plaintiff's § 1983 claims must be dismissed.

WHEREFORE, ABOVE PREMISES CONSIDERED, Defendant Mark Wells, moves this Court to enter an order denying Plaintiff's motion for summary judgment and, further, to grant summary judgment in his favor and against the Plaintiff as to the remaining claim against him.

Respectfully submitted, this 28th day of December, 2007.

> **s/Scott W. Gosnell**
> KENDRICK E. WEBB – Bar. No. WEB022
> SCOTT W. GOSNELL – Bar No. GOS002
> Attorney for Defendant Mark Wells
> WEBB & ELEY, P.C.
> 7475 Halcyon Pointe Road (36117)
> Post Office Box 240909
> Montgomery, Alabama 36124
> Telephone: (334) 262-1850
> Fax: (334) 262-1889
> E-mail: sgosnell@webbeley.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 28th day of December, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Faulton B. Eaglin
LAW OFFICES OF FULTON B. EAGLIN
220 E. Huron
Suite 210
Ann Arbor, MI 48104
Telephone: (734) 665-5355
Fax: (734) 665-0911
Email: fbeaglin@aol.com

James Robert McKoon, Jr.
McKoon & Thomas
P.O. Box 3220
Phenix City, AL 36868-3220
Telephone: (334) 297-2300
Fax: (334) 297-2777
Email: jrmckoon@aol.com

**s/Scott W. Gosnell**
OF COUNSEL