IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| ROSIE CLIATT, as Personal Representative of the Estate of DONTAVIUS CLIATT, <br><br>  Plaintiff, <br><br> v. <br><br> PHENIX CITY, ALABAMA, *et al.*, <br><br>  Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 3:06-cv-471-SRW [WO] |

**DEFENDANT MARK WELLS' REPLY TO PLAINTIFF'S
BRIEF IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

COMES NOW the Defendant, Mark Wells (hereafter, "Deputy Wells" or the "Defendant"), and submits his Reply to Plaintiff's Brief in Support of Her Motion for Summary Judgment and Response to Defendants' Motions for Summary Judgment. As grounds therefor, Defendant shows unto this Honorable Court the following:

**I.     DEPUTY WELLS' QUALIFIED IMMUNITY ARGUMENT IS PROPER.**

Plaintiff argues in her Reply Brief that Deputy Wells should be sanctioned for raising the defense of qualified immunity in his Motion for Summary Judgment. Plaintiff seems to think that once the issue has been ruled on at the Motion to Dismiss stage, the qualified immunity defense is thereafter barred from the litigation. However, Deputy Wells initially raised his defense of qualified immunity in his Motion to Dismiss, at which point the only evidence properly considered by this Court was those allegations made in the Plaintiff's Complaint. "[A]t the motion to dismiss stage, the scope of a court's review must be limited to the four corners of the complaint." Boyd v. Peet, No. 07-11276, 2007 WL 2781033, at *1 (11th Cir. Sept. 25, 2007) (quoting St. George v. Pinellas County, 285 F.3d 1334, 1337 (11th Cir. 2002)). This Court obviously recognizes this established

fact, inasmuch as this Court's Order dated December 12, 2007, liberally uses such phrases as "based on the allegations in the complaint," "the facts in the complaint," "it is clear from the face of the complaint," "there is no indication from the Complaint," and finally concluded that "based on the facts alleged in the complaint," Deputy Wells's Motion to Dismiss was due to be denied. Clearly, this Court properly limited itself to consideration of matters alleged in the Complaint.

In contrast, a Motion for Summary Judgment is supported by evidence not found in the Complaint. See Fed. R. Civ. P. 56; compare Fed. R. Civ. P. 12(b). Deputy Wells filed his Motion for Summary Judgment supported by numerous evidentiary submissions supporting his claim to qualified immunity, most of which submissions were initially presented to this Court by the Plaintiff herself. These evidentiary submissions were obviously not alleged in the Plaintiff's Complaint and therefore, were not properly considered by this Court at the Motion to Dismiss stage.

> [R]esolution of the immunity question may "require more than one judiciously timed appeal," because the legally relevant factors bearing upon the Harlow question will be different on summary judgment than on an earlier motion to dismiss. At that earlier stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for "objective legal reasonableness." On summary judgment, however, the plaintiff can no longer rest on the pleadings, see Fed. Rule Civ. Proc. 56, and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the Harlow inquiry. It is no more true that the defendant who has unsuccessfully appealed denial of a motion to dismiss has no need to appeal denial of a motion for summary judgment, than it is that the defendant who has unsuccessfully *made* a motion to dismiss has no need to *make* a motion for summary judgment.

Behrens v. Pelletier, 516 U.S. 299, 309 (1996) (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982)).

Therefore, in light of the submission of evidence outside the Complaint, it is entirely proper for Deputy Wells to again raise the defense of qualified immunity.

## II.  DEPUTY WELLS DID NOT VIOLATE THE DECEDENT'S CONSTITUTIONAL RIGHTS.

The Plaintiff puts a great deal of reliance on Phenix City Police Captain Hart's Report (the "Hart Report") – indeed, she seems to treat the Hart Report as the definitive statement of

facts. However, many of the Plaintiff's statements of "fact" are not supported by the Hart Report. For instance, the Plaintiff, for some unknown reason, makes repeated reference to a SWAT team.[1] However, there is no evidence in the record to support that a SWAT team was ever requested, dispatched or employed in this incident. Nowhere in Captain Hart's report does he make reference to a SWAT team. In fact, none of the documents in evidence make any reference whatsoever to a SWAT team. It is therefore puzzling why the Plaintiff would want to portray the responding officers as a specialized tactical SWAT team.

Plaintiff also states that "[a]fter Mr. Cliatt fired a shot at the police officers and was laying prone on the ground, the five officers fired 57 rounds back at Mr. Cliatt and killed him." (Plaintiff's Reply Brief at 4.) However, Captain Hart's report, which the Plaintiff insists is the true account of events, does not make this statement of "fact." In fact, the Hart Report makes it clear that the officers *stopped firing* after the Decedent fell to the ground, and that the officers refrained from firing even when the Decedent was again reaching for his 9mm handgun.[2] (See, generally, Hart Report.) Therefore, far from being "wholly unrebutted," these "facts" are incorrect and unsupported by the evidence before the Court.

As pointed out in Deputy Wells's Motion for Summary Judgment, the Hart Report is an internal memorandum consisting of interview statements of all five (5) Phenix City Police Officers involved in the incident, along with conclusions and recommendations associated with those statements. The stated purpose of the Report is "to determine if proper procedure(s) was

---

[1] "The police on the scene called for back up from the local SWAT team." (Plaintiff's Reply Brief at 3.) "Once the SWAT team arrived on the scene, five police officers immediately approached Mr. Cliatt's car in [sic] inconsistent, uncoordinated manner, with guns drawn." Id. at 4.

[2] "Deputy Wells and the PC Officers approached the Decedent as he was lying prone on the ground face up, and observed the Decedent attempting to reach for his pistol lying nearby. (Hart Report.) Lieutenant Daughtry retrieved the Decedent's pistol, and Officer Brennan, with the assistance of Officer Farley, secured the Decedent in handcuffs. (Hart Report.)" (Defendant Wells's Motion for Summary Judgment.)

followed by the involved officers of the PCPD [e.g. the Phenix City Police Department]." It is very important to note that this document is strictly confined to the Phenix City Police Department, and reflects the statements of only the PCPD officers and policies. Deputy Wells, a Russell County Sheriff's Deputy, was not interviewed for this Report, and Russell County Sheriff's Department policies and procedures were not reflected or represented. Nevertheless, Captain Hart ultimately concluded in his report that the defendants were justified in shooting the Decedent, in light of the fact that the Decedent brandished a firearm and fired at them.

Plaintiff also misrepresents the facts and arguments stated in Deputy Wells's Motion for Summary Judgment. In her Reply Brief, Plaintiff states that Deputy Wells's gun jammed, and therefore he was unable to shoot and kill the Decedent. (Plaintiff's Reply Brief at 7.) However, the correct fact, as evidenced by the Alabama Department of Forensic Sciences Firearms Report, and as argued by Deputy Wells, is that *the Decedent's gun jammed*[3] after one or two shots, thereby preventing him from killing the responding officers.[4] In fact, as shown by the evidence, Deputy Wells fired his firearm 9 times, but failed to hit the Decedent. Plaintiff, in her Reply Brief, appears to concede that Deputy Wells did not hit and kill the Decedent.[5] (See Plaintiff's Reply Brief at 7.)

---

[3] Not, as argued by the Plaintiff, Deputy Wells's gun.

[4] "Regardless of whether he fired first or not, the Decedent did fire his weapon; apparently, while the Decedent was firing his pistol, one of the fired cartridge cases failed to properly extract from the chamber of the pistol, and remained partially in the pistol's chamber, causing what is commonly known as a "malfunction" or "jam." (DFS Firearms Report at p. 3.) This jam rendered the weapon unable to fire the remaining seven (7) 9mm bullets remaining in the gun. Id. at p. 4." (Defendant Wells's Motion for Summary Judgment.)

[5] "The Alabama Department of Forensic Sciences investigations and reports are clear that the Decedent was shot seven times, all with .40 caliber bullets. (Department of Forensic Sciences Report of Autopsy dated May 5, 2003; DFS Firearms Report at pp. 13-14.) The only individuals shooting .40 caliber bullets on the scene were the Phenix City Defendants. Deputy Wells was shooting a Heckler and Koch 9mm pistol. (DFS Firearms Report at pp. 10-11.) Thus, the evidence is clear and undisputed that Deputy Wells did not shoot the Decedent, and therefore cannot be guilty of excessive force against him." (Deputy Wells's Motion for Summary Judgment.)

The Plaintiff argues that the police officers cornered the Decedent, thereby offering him no reasonable alternatives and provoking him to violence. However, it is undisputed that the Decedent chose to turn into the driveway and park where he did; he was not ordered to stop there. In fact, Deputy Wells did not even turn around and park behind the Decedent until the Decedent had already parked his car. Further, after ascertaining that the Decedent was a murder suspect, Deputy Wells did not approach the car, but instead ordered the Decedent to put his hands outside the car window. Therefore, even if the officers approaching the car could be stretched into provocation, Deputy Wells did not participate in that action, and cannot be held to have contributed to the provocation.

Plaintiff claims that "[o]nly when all the police officers drew their guns and converged on his car in a rash, inconsistent, confusing, and threatening manner did he get out of the car and shoot at the officers." (Plaintiff's Reply Brief at 6.) It is unclear exactly what the Plaintiff thinks should have been done differently. If the Plaintiff is arguing that police officers can never draw their weapons on a "compliant, non-threatening" murder suspect, then she is indeed attempting to make new law, at odds with the "objective reasonableness" test of Graham v. Connor, 490 U.S. 386, 395 (1989). See also Montoute v. Carr, 114 F.3d 181, 185 (11th Cir. 1997) ("[A]n officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force."); Elliott v. Leavitt, 99 F.3d 640, 641 (4th Cir. 1996) ("The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm.") However, if the Plaintiff is objecting to the rash, inconsistent, confusing and threatening manner in which some of the officers allegedly approached the car, then she is essentially arguing that every person who is approached by law enforcement officials in such a manner is constitutionally permitted to fire upon those officers for failing to perform their duties according to the suspect's standards.

The Decedent chose to resist arrest, as evidenced by his statement that he was not going to "go out like this." That was his choice, and it was a meaningful one. He had other options, such as obeying instructions to place his hands outside the car window, and allowing himself to be taken into custody. Instead, he chose to engage in a gunfight with the Defendants, at which point the Defendants fired back.

Plaintiff's reliance on Gilmere v. City of Atlanta, 774 F.2d 1495 (11th Cir. 1985), abrogated by Nolin v. Isbell, 207 F.3d 1253, 1256 (11th Cir. 2000) is misplaced, inasmuch as the facts in that case are dramatically different. In Gilmere, it is important to note that the decedent was intoxicated, was unarmed, and the police officers were beating him on his head. Id. at 1497. The decedent resisted arrest while he was being escorted, in an effort to escape the beating he was receiving. Id. The summary statement by the Court of Appeals is sufficient to demonstrate the dissimilarity:

> . . . [T]he police had little cause to believe [the decedent] himself to be dangerous. Given his small size, intoxicated state, and *lack of a weapon*, he clearly posed little threat to their safety when they initially began escorting him to the patrol car. Finally, as we have pointed out in Section A above, the district court's findings of fact establish that [the decedent] did little to provoke the police officers to beat him. That unwarranted intrusion, as well as the unwarranted shooting which directly resulted from his efforts to escape the officers' further physical abuse, give grounds for relief under the fourth amendment.

Gilmere, 774 F. 2d at 1502.

Unlike Gilmere, and as this Court has recognized in the case at bar, the officers had every reason to believe that the Decedent was dangerous; he was a robbery/murder suspect! He had a weapon, was at the very least brandishing it towards the officers, and at the very most firing on the officers. That certainly constitutes provocation under any standard. Finally, the Defendants here had offered no abuse to the Decedent. At the point when the Decedent exited the car and began firing on them, the officers had not laid hands on him, had not threatened him, and had taken no provocative action towards him other than drawing their firearms (a sensible precaution) and telling

him to put his hands out the car window.  Apparently the Plaintiff thinks it unreasonable for a law enforcement officer to draw his firearm when confronting and attempting to arrest a murder suspect who is presumed armed and dangerous.  However, there is no legal authority for that position.

Plaintiff also argues that given the fact that the Defendants had a right to fire back at the Decedent after he first fired at them, the Defendants exercised excessive force by firing fifty-seven (57) rounds!  In fact, the Plaintiff argues that "[s]urely trained and competent police officers know it does not take 57 rounds of gunfire to eliminate the threat of one man who had fired a single shot at the police and was laying on the ground with no way of escape." (Plaintiff's Reply Brief at 7.)  The gist of the Plaintiff's argument seems to be that even if the Defendants were constitutionally authorized to use lethal force against the Decedent, fifty-seven rounds was *too* lethal, and therefore unduly punished the Decedent in addition to killing him.  However, Plaintiff fails to recognize that, though fifty-seven rounds were fired, only seven (7) hit the Decedent.  That is a *hit ratio of only twelve percent (12%)*!  Though it is unlikely, it is possible that the Defendants could have fired only fifty (50) rounds – seven less than were actually fired – and failed to hit the Decedent at all!  In short, at a hit rate of twelve percent, fifty-seven rounds were required to be fired in order to hit the Decedent seven times and end the threat.  Noticeably, Plaintiff does not argue that *the seven rounds that actually struck* the Decedent was excessive, just that *the number of rounds fired* was excessive.

### III. NO CLEARLY ESTABLISHED LAW PROVIDED DEPUTY WELLS WITH FAIR WARNING THAT HIS CONDUCT WAS UNLAWFUL.

Even if the Plaintiff could put forth some evidence that Deputy Wells violated the Decedent's rights, she still cannot show that Deputy Wells had fair warning that his conduct was unlawful.  The Plaintiff must show that clearly established law provided Deputy Wells with fair warning that his conduct was unlawful by either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or federal constitutional provision are specific enough to demonstrate conduct was illegal, even in

the total absence of case law. Storck v. City of Coral Springs, 354 F.3d 1307, 1317 (11th Cir. 2003) (citations omitted). The Eleventh Circuit has identified the latter method as an "obvious clarity" case. Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted). In order to show that the Deputy Wells' conduct was unconstitutional with "obvious clarity," "the unlawfulness must have been apparent." Willingham, 321 F.3d at 1301. "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Storck, 354 F.3d at 1318 (quoting 28 F.3d at 1149).

"In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins v. Talladega Bd. of Educ., 115 F.3d 821, 827 (11th Cir. 1997) (en banc) (citations omitted). Therefore, the Plaintiff's resort to Michigan Supreme Court and Ninth Circuit law does not suffice to establish the state of the law for purposes of qualified immunity in the Eleventh Circuit. (See, Plaintiff's Reply Brief at 5, 7.)

After a diligent search of the relevant case law, counsel for this Defendant has been unable to find a case involving materially similar facts that held conduct similar to the undisputed conduct in the record to be unlawful. To the contrary, the existing case law upholds the conduct of Deputy Wells. See, e.g., Brousseau, 543 U.S. at 201; Arrugueta, 415 F.3d at 1256; Troupe, 419 F.3d at 1168; Draper, 369 F.3d at 1278; Elliott, 99 F.3d at 645. Consequently, the Plaintiff has the burden of either identifying such a case or proving that the conduct of Deputy Wells was obviously illegal.

WHEREFORE, ABOVE PREMISES CONSIDERED, Defendant Mark Wells moves this Court to enter an order denying Plaintiff's Motion for Summary Judgment and further, to grant summary judgment in his favor and against the Plaintiff as to the remaining claim against him.

Respectfully submitted this 23rd day of January, 2008.

                                        **s/Scott W. Gosnell**
                                        KENDRICK E. WEBB (WEB022)
                                        SCOTT W. GOSNELL (GOS002)
                                        Attorneys for Defendant Mark Wells

OF COUNSEL:

WEBB & ELEY, P.C.
7475 Halcyon Pointe Drive (36117)
Post Office Box 240909
Montgomery, Alabama  36124
Telephone:  (334) 262-1850
Fax:  (334) 262-1889
E-mail:  sgosnell@webbeley.com


                                 **<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that on this the 23rd day of January, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to **Fulton B. Eaglin, Esquire; James Robert McKoon, Jr., Esquire; Joshua R. McKoon, Esquire**; and **James Paul Graham, Jr., Esquire**.


                                        **s/Scott W. Gosnell**
                                        OF COUNSEL